# EXHIBIT A

KEITH B. JOSEPH, ESQUIRE
IDENTIFICATION NO. 203997
Ballard Spahr LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599
PHONE: 215-864-8336
FAX:  215-864-8999

**ATTORNEY FOR DEFENDANTS**

2010-25213-0008
11-3-2010 10:50:14 AM
Acceptance of Service By
Receipt # Z1046543        Fee       $0.00
Mark Levy - Montgomery County Prothonotary

| | |
|---|---|
| MICHAEL E. CAIN   et al. | : COURT OF COMMON PLEAS OF |
| | : MONTGOMERY COUNTY, |
| | : PENNSYLVANIA |
| | : |
| PLAINTIFF | : |
| v. | : No. 2010-25213 |
| | : |
| COUNTRYWIDE HOME LOANS, INC. et al | : |
| | : |
| | : |
| DEFENDANTS | : CIVIL ACTION |
| | : |

## ACCEPTANCE OF SERVICE OF COMPLAINT

TO THE PROTHONOTARY:

I have entered my appearance in this matter and accepted service of the Complaint in the above-captioned matter on behalf of Countrywide Home Loans, Inc. and Bank of America, Inc. on **October 6, 2010**.

Date: 11/2/2010

Keith B. Joseph, Esquire

*Attorney for Defendants, Countrywide Home Loans, Inc. and Bank of America, Inc.*



**73**

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

Montgomery _____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: 10-25213 | TIME STAMP |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Transfer from Another Jurisdiction
- ☐ Petition
- ☐ Declaration of Taking
- ☐ Notice of Appeal

| Lead Plaintiff's Name: Michael E. Cain | Lead Defendant's Name: Countrywide Home Loans, Inc. |
|---|---|

☐ **Check here if you are a Self-Represented (Pro Se) Litigant**

Name of Plaintiff/Appellant's Attorney: Robert J. Birch, Esqu

Are money damages requested? : ☒ Yes ☐ No    Dollar Amount Requested: (Check one) $50,000    ☐ within arbitration limits   ☒ outside arbitration limits

Is this a *Class Action Suit?* ☐ Yes ☒ No

**SECTION B**

<u>Nature of the Case:</u> Place an "X" to the left of the <u>ONE</u> case category that most accurately describes your *PRIMARY CASE*. If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☒ Other: Fraud/Forgery

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Zoning Board
- ☐ Statutory Appeal: Other

Judicial Appeals
- ☐ MDJ - Landlord/Tenant
- ☐ MDJ - Money Judgment
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin

- ☐ Other:

*Pa.R.C.P. 205.5*                 2/2010

Robert J. Birch, Esquire                    Attorney for Plaintiffs
Id. No. 65816
325 Swede Street
Norristown, PA 19401
(610) 277-9700

---

MICHAEL E. CAIN                        :
7458 S. Main Street                    : COURT OF COMMON PLEAS OF
Coopersburg, PA 18036                  : MONTGOMERY COUNTY
        and                            :
MICHAEL E. CAIN, ADMINISTRATOR         :
OF THE ESTATE OF MARY L. CAIN,         :
DECEASED                               :
7458 S. Main Street                    :
Coopersburg, PA 18036                  :
        Plaintiffs,                    :
            v.                         :
COUNTRYWIDE HOME LOANS, INC.           :NO.  10-25213
7105 Corporate Drive                   :
PTX B-35                               :
Plano, TX 75024-3632                   :
        and                            :
BANK OF AMERICA                        :
Bank of America Corporate Center       :
Charlotte, NC 28255                    :
        and                            :
FIRST AMERICAN TITLE INSURANCE         : CIVIL ACTION
COMPANY                                :
620 Freedom Business Center            :
King of Prussia, PA 19406              :
        and                            :
SEAN MORAN                             :
660 Newtown-Yardley Road               :
Suite 102                              :
Newtown, PA 18940                      :
                                       :
        Defendants                     : JURY TRIAL DEMANDED

---

## NOTICE

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST
THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE
ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND
NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE
PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE
COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH
AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO, THE

CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE
ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE
FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER
CLAIMS OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE
MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF
YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE
OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU
WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT
AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE
YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL
SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Reference Service
100 West Airy Street (Rear)
Norristown, PA 19404-0268
(610) 279-9660, Extension 201

2

Robert J. Birch, Esquire            Attorney for Plaintiffs
Id. No. 65816
325 Swede Street
Norristown, PA 19401
(610) 277-9700

| | |
|---|---|
| MICHAEL E. CAIN | : COURT OF COMMON PLEAS OF |
| 7458 S. Main Street | : MONTGOMERY COUNTY |
| Coopersburg, PA 18036 | : |
| and | : |
| MICHAEL E. CAIN, ADMINISTRATOR | : |
| OF THE ESTATE OF MARY L. CAIN, | : |
| DECEASED | : |
| 7458 S. Main Street | : |
| Coopersburg, PA 18036 | : |
| Plaintiffs, | : |
| v. | : |
| COUNTRYWIDE HOME LOANS, INC. | :NO. *10 - 25213* |
| 7105 Corporate Drive | : |
| PTX B-35 | : |
| Plano, TX 75024-3632 | : |
| and | : |
| BANK OF AMERICA | : |
| Bank of America Corporate Center | : |
| Charlotte, NC 28255 | : |
| and | : |
| FIRST AMERICAN TITLE INSURANCE | : CIVIL ACTION |
| COMPANY | : |
| 620 Freedom Business Center | : |
| King of Prussia, PA 19406 | : |
| and | : |
| SEAN MORAN | : |
| 660 Newtown-Yardley Road | : |
| Suite 102 | : |
| Newtown, PA 18940 | : |
| | : |
| Defendants | : JURY TRIAL DEMANDED |

2010-25213-0000
8/25/2010 9:27:06 AM
Complaint Civil Action
Receipt # 2010-8-0171     Fee     $251.00
Mark Levy - Montgomery County Prothonotary

## COMPLAINT

Plaintiff, Michael E. Cain ("Plaintiff"), by and through his undersigned counsel,

files the following Complaint, and in support thereof, avers as follows:

## Parties

1.      Michael Cain is an adult individual who resides at 7458 S. Main Street Coopersburg, PA 18036.  At the time the events herein occurred, Mr. Cain resided at 3301 Lisa Lane, Norristown, Pennsylvania 19403.

2.      Michael E. Cain is also the Administrator of the Estate of Mary L. Cain, Deceased, and was appointed by the Register of Wills of Montgomery County on September 12, 2008.

3.      Plaintiff, Michael E. Cain, individually, is a consumer within the meaning of 15 U.S.C. §1692a(3).

4.      Michael E. Cain will be referred to herein as "Plaintiff" and Michael E. Cain and Michael E. Cain, Administrator of the Estate of Mary L Cain will be collectively referred to as "Plaintiffs".

5.      Defendant Countrywide Home Loans, Inc. is a business corporation with an address at 7105 Corporate Drive, PTX B-35, Plano, Texas, 75024 ("Countrywide").

6.      Defendant Bank of America is a business corporation with an address at Bank of America Corporate Center, Charlotte, NC, 28255("BOA").

7.      Defendant First American Title Insurance Company is a Pennsylvania business corporation with an address at 620 Freedom Business Center, King of Prussia, PA 19406 ("First American").  First American is conducting business in Pennsylvania and is the underwriter for the title on the property at issue in this Complaint.

8.      Defendant Sean Moran is an adult individual with an address at 660 Newtown-Yardley Road, Suite 102,  Newtown, PA 18940 ("Moran").  Moran notarized the false documents that purported to be the closing documents on the property at issue in this Complaint.

4

9.    Countrywide, BOA, First American and Moran will be referred to herein collectively as "Defendants".

### The Underlying Mortgage and Fraud

10.    On or about July 16, 2004, Mary L. Cain purchased the residence at 3301 Lisa Lane, Norristown, PA 19403(the "Property"). See **Exhibit "A"**.

11.    The purchase price for the Property was $292,000 and was secured by a mortgage issued by First Magnus Financial Corporation [1] for $277,400.

12.    Only Mary L. Cain was the mortgagor and was the sole applicant to First Magnus for a mortgage loan, having completed a Uniform Residential Loan Application. The mortgage was conventional with a fixed interest rate of 6.875 and monthly payments of $1,822.32. Attached hereto and marked as **Exhibit "B"** are copies of the mortgage and the note which was provided at closing.

13.    Only Mary L. Cain was approved by First Magnus for a mortgage on the Property.

14.    At some point, the exact date of which is unknown, Countrywide assumed or purchased the mortgage from First Magnus.

15.    First American provided title insurance for the Property.

16.    Settlement on the Property was on July 16, 2004. The closing documents were printed for only Mary L. Cain's signature, including the HUD-1 statement, the Federal Truth-In-Lending statement, the mortgage, and the note. See **Exhibit "C"**.

17.    Plaintiff never executed the mortgage or the note at closing.

---

[1] First Magnus Financial Corporation is a defunct business corporation with an address at 5210 E. Williams Circle, Suite 750, Tucson, AZ, 85711.

5

18.     However, Countrywide, First American, Moran, and/or their agents and employees either at the closing or shortly thereafter, forged Plaintiff's name on the mortgage document. See **Exhibit "D"**.

19.     Plaintiff's signature is a forgery.  In fact, Plaintiff's name is handwritten and misspelled as "MICHEAL" on the mortgage document.

20.     Further, the notarial seal is false.  The mortgage document contains a notary signature by Moran on July 19, 2004, *three days after* the mortgage was purportedly executed by Plaintiff.  However, neither Plaintiff nor Mary Cain ever appeared before Moran on July 19, 2004.

21.     On July 19, 2004, the day that Moran affixed his signature to the mortgage, Mary L. Cain was in South Carolina and Plaintiff was at work.

22.     Upon information and belief, Plaintiff's signature was forged by Countrywide, First American and/or Moran, or by those acting on their behalf.

**Countrywide Changes the Terms of the Mortgage**

23.     Upon information and belief, at some time the exact date of which is unknown, First Magnus and/or Countrywide treated the loan as a "jumbo loan" in order to charge excess private mortgage insurance or "PMI."

24.     At the time that Mary L. Cain purchased the Property, she deposited in escrow $3,958.85 in taxes.

25.     Mary L. Cain made the mortgage payments to Countrywide, the purported servicer on the mortgage, until she died on November 6, 2007.  The mortgage payments constantly fluctuated.

26.     Although Mary L. Cain had executed a conventional mortgage, Countrywide claimed that Mary L. Cain executed a "jumbo mortgage", a mortgage loan above conventional conforming loan limits.

27.     Upon information and belief, Countrywide claimed that Mary L. Cain executed a jumbo loan in order for Countrywide to coerce Mary L. Cain to pay private mortgage insurance, or "PMI", in excess of what was required, which increased over the life of the mortgage executed by Mary L. Cain.

**The Sheriff Sale**

28.     On or about January 31, 2008, Countrywide sent Mary L. Cain an Act 91 Notice which purported to inform her that the mortgage payment was late for one month, or December 2007. Countrywide alleged that the monthly amount was $5,127.90. See **Exhibit "E"**.

29.     Because Mary L. Cain was deceased, Plaintiff paid the past due amount to Countrywide.

30.     Then, on or about July 31, 2008, Countrywide instituted a foreclosure suit in the Court of Common Pleas against both Mary L. Cain and Plaintiff for missed mortgage payments for March through May of 2008. See **Exhibit "F"**.

31.     The Complaint, *inter alia*, alleged that Plaintiff was the mortgagor, that Plaintiff executed a mortgage with First Magnus, and that Plaintiff was responsible for the mortgage payments, allegations that were blatantly incorrect.

32.     Attached to the Complaint was an Act 91 notice allegedly sent to both Mary L. Cain and to Plaintiff Michael E. Cain. Since Mary L. Cain was deceased, she could not have received such notice. Moreover, Plaintiff neither received such notice, nor was such notice valid as Plaintiff was not the mortgagor.

7

33.     However, Countrywide claimed that the monthly mortgage payment was now $2,563.95, which was not the correct amount.

34.     Specifically, Countrywide's complaint at Par. 6 alleged that Plaintiff owed Countrywide the following total amount on the mortgage:

6.   The following amounts are due to Plaintiff on the Mortgage:

| | |
|---|---:|
| Principal Balance | $266,163.95 |
| Interest from 02/01/2008 through 06/11/2008 at 6.8750% | $6,617.16 |
| Per Diem interest rate at $50.13 | |
| Reasonable Attorney's Fee at 5% of Principal Balance as more fully explained in the next numbered paragraph | $13,308.20 |
| Late Charges from 03/01/2008 to 06/11/2008 | $364.48 |
| Monthly late charge amount at $91.12 | |
| Costs of suit and Title Search | $900.00 |
| Monthly Escrow amount $741.63 | |
| | **$287,353.79** |

35.     Because Plaintiff was attempting to be appointed as personal representative of Mary L. Cain's estate, and since no one was acting on behalf of her estate, the mortgage payments were not made.  Rather, Countrywide received a default judgment in a mortgage foreclosure and exposed the Property to a sheriff's sale on November 19, 2008.

36.     Plaintiff informed Countrywide that he was not the mortgagor but had just been appointed as Administrator of Mary L. Cain's estate in September of 2008 and that the Property was part of the estate and could be subject to the claims of other beneficiaries of the estate.

37.     Countrywide refused to remove the Property from sheriff sale and demanded $27,283.74 as follows:

| Monthly payments | 2 @ $2,563.95 | $5,127.90 |
| | 6 @ $2,607.07 | $15,642.42 |
| Accumulated Late Charge Balance | | $328.96 |
| Property Inspections | | $45.00 |
| Corporate Advance | | $780.96 |
| Foreclosure Costs | | $3,733.50 |
| Foreclosure Counsel Fees | | $1,625.00 |
| **TOTAL AMOUNT DUE MORTGAGE COMPANY** | | **$27,283.74** |

38. Plaintiff informed Countrywide that the monthly mortgage amounts that
Countrywide claimed were due were incorrect. Moreover, Plaintiff demanded
explanation as to the "Foreclosure Costs" and "Corporate Advance".

39. Countrywide claimed that part of the costs were "sheriff service costs" of
$3,020 and "standard foreclosure fee" of $1,250.

40. Countrywide refused to remove the Property from sheriff sale until these
amounts were paid.

41. Faced with losing a potential estate asset, Plaintiff was forced to pay the
$27,283.74 to Countrywide.

42. The debt at issue arises out of a transaction which was primarily
for personal, family or household purposes.

43. Countrywide overstated the amount of fees due from Plaintiff to the
sheriff in connection with a foreclosure sale that did not proceed to completion as these
sums were only deposits.

44. Moreover, at the time the Complaint was filed, Defendants failed to credit
Mary L. Cain with the monthly mortgage overpayments and escrow balance paid.

9

Specifically, Countrywide and/or BOA consistently increased the monthly mortgage amount without explanation; in 2004, the monthly mortgage amount was $2,505.90; in 2005, $2,566.64; in 2006, $2,581.14; in 2007, $2,563.98; in 2008, $2,607.07; in 2009, $2,619.09.

45.     In addition, First Magnus, Countrywide, and/or BOA received escrow payments for the annual property taxes which to date have not been accounted for.

46.     Despite Plaintiff paying Defendants the inflated demand in November of 2008 to stop the sheriff sale, Defendants have not properly accounted for the mortgage payments and PMI made, and have not accounted for the sheriff fees and costs paid by Plaintiff.

COUNT I
Fraud
**Plaintiffs v. All Defendants**

47.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

48.     <u>Only</u> Mary L. Cain was the mortgagor and was the sole applicant to First Magnus for a mortgage loan, having completed a Uniform Residential Loan Application. The mortgage was conventional with a fixed interest rate of 6.875 and monthly payments of $1,822.32.

49.     Only Mary L. Cain was approved by First Magnus for a mortgage on the Property.

50.     At some point, the exact date of which is unknown, Countrywide assumed or purchased the mortgage from First Magnus.

51.     First American provided title insurance for the Property.

10

52.     Settlement on the Property was on July 16, 2004. The closing documents were printed for only Mary L. Cain's signature, including the HUD-1 statement, the Federal Truth-In-Lending statement, the mortgage, and the note.

53.     Plaintiff never executed the mortgage or the note at closing.

54.     However, Countrywide, First American, Moran, and/or their agents and employees either at the closing or shortly thereafter, forged Plaintiff's name on the mortgage document.

55.     Plaintiff's signature is a forgery.   In fact, Plaintiff's name is handwritten and misspelled as "MICHEAL" on the mortgage document.

56.     Further, the notarial seal is false. The mortgage document contains a notary signature by Moran on July 19, 2004, *three days after* the mortgage was purportedly executed by Plaintiff. However, neither Plaintiff nor Mary Cain ever appeared before Moran on July 19, 2004.

57.     On July 19, 2004, the day that Moran affixed his signature to the mortgage, Mary L. Cain was in South Carolina and Plaintiff was at work.

58.     Upon information and belief, Plaintiff's signature was forged by Countrywide, First American and/or Moran, or by those acting on their behalf.

59.     First American issued title insurance on the Property based on forged documents.

60.     Moran made misrepresentations that were false when he signed as a notary to Plaintiffs' forged signature three days after closing when Plaintiffs were not present and did not sign in front of Moran.

61.     Moran improperly, falsely, and fraudulently acted as a notary by signing

11

that he witnessed Plaintiffs' signatures when Plaintiffs never appeared before Moran and never signed the loan documents on the date that Moran affixed his notary seal.

WHEREFORE, Plaintiffs demand judgment against Countrywide Home Loans, Inc., Bank of America, First American Title Insurance Company, and Sean Moran,  jointly and severally for damages in excess of $50,000, plus punitive damages, interest, attorney's fees, costs, and such other relief as this Court deems just and proper.

## COUNT II
### Negligence
### Plaintiffs v.  All Defendants

62.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

63.    Countrywide, BOA, First American and Moran owed plaintiffs a duty to act with reasonable care and due diligence regarding the transaction at issue.

64.    Countrywide, BOA, First American and Moran breached that duty.  Such breaches include negligently accepting forged documents.

65.    As a direct and proximate result of the negligence, Plaintiffs were harmed.

WHEREFORE, Plaintiffs demand judgment against Countrywide Home Loans, Inc., Bank of America, First American Title Insurance Company, and Sean Moran,  jointly and severally for damages in excess of $50,000, plus punitive damages, interest, attorney's fees, costs, and such other relief as this Court deems just and proper.

12

## COUNT III
### Good Faith and Fair Dealing
### Plaintiffs v. All Defendants

66.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

67.     Countrywide, BOA, First American and Moran owed Plaintiffs a duty of good faith and fair dealing under Pennsylvania law.

68.     Countrywide, BOA, First American and Moran breached that duty of good faith and fair dealing. Such breaches include forging Plaintiff's signature on the mortgage documents, notarizing a false signature three days after the closing took place, and issuing title insurance on false documents.

69.     As a direct and proximate result of the breaches of the duty of good faith and fair dealing, Plaintiffs were harmed.

WHEREFORE, Plaintiffs demand judgment against Countrywide Home Loans, Inc., Bank of America, First American Title Insurance Company, and Sean Moran, jointly and severally for damages in excess of $50,000, plus punitive damages, interest, attorney's fees, costs, and such other relief as this Court deems just and proper.

## COUNT IV
### Violations of Pennsylvania's Fair
### Credit Extension Uniformity Act, 73 P.S. § 2270 *et seq.*
### Plaintiff v. Countrywide and Bank of America

70.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

71.     Countrywide and BOA acted intentionally with the purpose of coercing

Plaintiffs to pay debts that he did not in fact owe.

72. The conduct of Countrywide and BOA, as alleged throughout this Complaint, violates the federal FCDPA.

73. Defendants' violations of the federal FCDPA are, by statutory definition, violations of the state FCEUA, 73 P.S. § 2270.4(a).

74. Defendants' conduct otherwise constitutes an unfair or deceptive practice with regard to the collection of debts within the meaning of 73 P.S. § 2270.4.

75. As a direct and proximate result of the violations of the FCEUA, Plaintiffs have sustained actual and statutory damages for which Countrywide and BOA are liable, together with reasonable attorney's fees and the costs of prosecuting this action.

WHEREFORE, Plaintiffs seeks judgment in Plaintiff's favor and damages against Countrywide Home Loans, Inc., and Bank of America, jointly and severally, based on the following requested relief:

    (a)    Actual damages;

    (b)    Statutory damages;

    (c)    Punitive damages;

    (d)    Costs and reasonable attorney's fees; and

    (e)    Such other and further relief as may be necessary, just and proper.

14

## COUNT V
## INVASION OF PRIVACY/FALSE LIGHT
### Michael E. Cain v. All Defendants

76.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

77.     At all times material hereto, Defendants were acting in joint concert with each other, by and through their agents, servants and/or employees who were acting within the course and scope of their agency. or employment, and under the direct supervision and control of Defendants herein.

78.     On or about July 31, 2008, Countrywide instituted a foreclosure suit in the Court of Common Pleas against both Mary L. Cain and Plaintiff for missed mortgage payments for March through May of 2009.  The suit against Plaintiff, Michael E. Cain, was based on forged and false documents.

79.     Further, Moran made material representations that were false when he signed as a notary to Plaintiffs' forged signature three days after closing when Plaintiff was not present and did not sign in front of Moran.

80.     Moran improperly, falsely, and fraudulently acted as a notary by signing that he witnessed Plaintiffs' signatures when Plaintiffs never appeared before Moran and never signed the loan documents on the date that Moran affixed his notary seal.

81.     Defendants above actions violated Plaintiff's right of privacy by placing the Plaintiff, Michael E. Cain, in a false light before the eyes of others, including potential credit grantors and creditors as well as family, friends and the

general public.

82.    By such unauthorized publication and circulation of Plaintiff's name and the inaccurate information, Defendants invaded Plaintiff's right to privacy, subjected Plaintiff to ridicule and contempt, injured Plaintiffs personal esteem, reflected disgracefully on Plaintiff's character, diminished Plaintiff's high standing, reputation and good name among family, friends, neighbors and business associates, destroyed Plaintiff's peace of mind, and caused Plaintiff severe distress.

83.    The conduct of Defendants was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, damages and harm to Plaintiff that are outlined more fully above and, as a result, Defendants are liable to compensate the Plaintiff for the full amount of actual, compensatory and punitive damages, as well as such other relief, permitted under the law.

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against Countrywide Home Loans, Inc., Bank of America, First American Title Insurance Company, and Sean Moran, jointly and severally, based on the following requested relief:

    (a)    Actual damages;

    (b)    Statutory damages;

    (c)    Punitive damages;

    (d)    Costs and reasonable attorney's fees; and

    (e)    Such other and further relief as may be necessary, just and proper.

16

## COUNT VI
## ACCOUNTING
### Plaintiffs v. Countrywide and Bank of America

84.    Plaintiffs incorporate the foregoing paragraphs as though the same

were set forth at length herein.

85.    At the time the foreclosure complaint was filed, Countrywide and BOA

failed to credit Mary L. Cain with the monthly mortgage overpayments and escrow

balance paid. Specifically, Countrywide and/or BOA consistently increased the monthly

mortgage amount without explanation; in 2004, the monthly mortgage amount was

$2,505.90; in 2005, $2,566.64; in 2006, $2,581.14; in 2007, $2,563.98; in 2008,

$2,607.07; in 2009, $2,619.09.

86.    Moreover, Plaintiffs made tax payments to First Magnus and/or

Countrywide at closing and thereafter which were part of the escrow balance and which

Countrywide and BOA failed to account for.

87.    Countrywide and BOA had a duty to properly account for these

payments.

WHEREFORE, Plaintiff demands an accounting of all mortgage payments

made to Countrywide Home Loans, Inc., and Bank of America from inception of the

loan, including the escrow account and all private mortgage insurance payments

made.

17

## COUNT VII
## MONEY HAD AND RECEIVED
### Plaintiffs v. All Defendants

88.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

89.     As set forth above, Defendants demanded and collected amounts for closing costs, mortgage payments, sheriff fees, attorney fees and other costs in amounts in excess of that permitted by contract or Pennsylvania law.

90.     Further, Moran and First American were paid fees at closing for services that were based on forged mortgage documents.

91.     By doing so, Defendants came into possession of money that they had no right to at law or in equity.

92.     It would be inequitable for Defendants to retain any such monies or to exercise use of such monies that it had no legal right to charge or collect in the first place.

93.     As a consequence, Plaintiffs have been damaged.

WHEREFORE,  Plaintiff demand judgment against Defendants jointly and severally for damages determined to be sustained, plus pre-judgment interest, costs of suit and other such relief as this Honorable Court deems just and proper.

### COUNT VIII
### Abuse of Process
### Plaintiffs v. All Defendants

94.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

95.    The foreclosure suit against Plaintiff, Michael E Cain, the filing was intentional, willful, wanton malicious and with reckless disregard of the rights of Plaintiff.

96.    At all times relevant hereto, Defendants commenced, continued and/or prosecuted the foreclosure action against Michael E. Cain without probable cause.

97.    At all times relevant hereto, Defendants acted in a grossly negligent manner in commencing, continuing and/or prosecuting the foreclosure action against Michael E. Cain.

98.    Defendants intentionally misrepresented the material facts of the action against Plaintiff.

99.    Defendants are liable to Plaintiff for his losses, expenses and damages pursuant to 42 Pa. C.S.A. §8351 et seq., for wrongful use of civil proceedings.

WHEREFORE,  Plaintiff demands judgment against Countrywide Home Loans, Inc., Bank of America, First American Title Insurance Company, and Sean

19

Moran jointly and severally for damages determined to be sustained, plus pre-judgment interest, costs of suit and other such relief as this Honorable Court deems just and proper.

### COUNT IX
### PENNSYLVANIA ACT 6 of 1974
#### Plaintiffs v. Countrywide Home Loans, Inc., and Bank of America

100.   Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

101.   Plaintiff Mary E. Cain's mortgage is a "residential mortgage obligation" covered by Pennsylvania Act 6 of 1974, 41 Pa. Stat. 101-605.

102.   Defendants have repeatedly failed to provide Plaintiffs with an accurate notice of the amount required to cure Ms. Cain's mortgage default, as required by 41 P.S. 403, and has improperly demanded payment of improper amounts and has thwarted Ms. Cain's, or her estate's, right to cure any default, under 41 P.S. 404, and has applied some of the payments to amounts not due under the mortgage and Act 6.

WHEREFORE, Plaintiffs demand a declaration that to Countrywide Home Loans, Inc.'s, and Bank of America's actions violated Act 6 and order a proper accounting and application of Plaintiffs' mortgage payments and for actual, statutory, and punitive damages, and attorney's fees and costs, along with any other and further relief as the court deems just and proper.

20

## COUNT X
### Plaintiff v. Sean Moran

103.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

104.    Moran made material representations that were false when he signed as a notary to Plaintiffs' forged signature three days after closing when Plaintiff was not present and did not sign in front of Moran.

105.    Moran improperly, falsely, and fraudulently acted as a notary by signing that he witnessed Plaintiffs' signatures when Plaintiffs never appeared before Moran and never signed the loan documents on the date that Moran affixed his notary seal.

106.    Moran's misconduct is a violation of the Pennsylvania Notary Public Law, MCL 55.261 et seq.

107.    Plaintiffs have suffered monetary and other losses as a result of Moran's misconduct in the performance of a notarial act, for which Plaintiffs are entitled to damages. MCL 55.273.

WHEREFORE, Plaintiffs demand judgment against Sean Moran  for damages in excess of $50,000, plus punitive damages, interest, attorney's fees, costs, and such other relief as this Court deems just and proper.

## COUNT XI
### Rescission
### Plaintiffs v. All Defendants

108.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

109.     The loan documents, including the mortgage and note, were procured by fraud and forgery and are invalid, and lack consideration, as set forth above.

110.     Accordingly, the loan documents should be rescinded and the parties restored to their original position.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally including rescission of the mortgage and note, along with any other and further relief as the court deems just and proper.

Dated: ___8/04/2010___

_____
Robert J. Birch, Esquire
*Attorney for Plaintiffs*

22

## VERIFICATION

I, Michael E. Cain, hereby state that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

DATED: _8/24/10_                                        _____
                                                        Michael E. Cain

# EXHIBIT A

(Page 26 of 73)

# Princeton Assurance CORPORATION

A.   Settlement Statement
U.S. Department of Housing and Urban Development
OMB No. 2502-0265 REV. HUD-1 (3/86)

**B. TYPE OF LOAN**

1. ☐FHA   2. ☐FmHA   3. ☐Conv. Unins.
4. ☐VA   5. ☐Conv. Ins.

**6. FILE NUMBER** PA04-3828FAT     **7. LOAN NUMBER**

**8. MORTGAGE INSURANCE CASE NUMBER**

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

TitleExpress Settlement System
Printed 07/16/2004 at 08:42 OW

**D. NAME OF BORROWER:** Mary L. Cata
**ADDRESS:** 150 Stetson Drive, Chalfont, PA 18914

**E. NAME OF SELLER:** Stephen Cicala and Joann Cicala
**ADDRESS:** 3301 Lisa Lane, Norristown, PA 19403

**F. NAME OF LENDER:** Princeton Mortgage Corporation
**ADDRESS:** an Arizona Corporation, 5285 East Williams Circle, Ste1, Tucson, AZ 85711

**G. PROPERTY ADDRESS:** 3301 Lisa Lane, Norristown, PA 19403

**H. SETTLEMENT AGENT:** Princeton Assurance Corporation
**PLACE OF SETTLEMENT:** 2492 Pennington Rd, Suite Two, Pennington, NJ 08534

**I. SETTLEMENT DATE:** 07/16/2004

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 292,000.00 | 401. Contract sales price | 292,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 13,240.74 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments for items paid by seller in advance* | | *Adjustments for items paid by seller in advance* | |
| 107. County taxes 07/16/04 to 12/31/04 | 393.13 | 407. County taxes 07/16/04 to 12/31/04 | 393.13 |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 305,633.87 | **420. GROSS AMOUNT DUE TO SELLER** | 292,393.13 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | 15,000.00 | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loans | 277,400.00 | 502. Settlement charges to seller (line 1400) | 20,844.03 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff 438654721118R 433 | 12,458.53 |
| | | Wachovia Bank, N.A. | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments for items unpaid by seller* | | *Adjustments for items unpaid by seller* | |
| 213. School Tax 7-1-04 to 7/16/04 | 164.38 | 513. School Tax 7-1-04 to 7/16/04 | 164.38 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 292,564.38 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 33,464.94 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 305,633.87 | 601. Gross amount due to seller (line 420) | 292,393.13 |
| 302. Less amounts paid by/for borrower (line 220) | 292,564.38 | 602. Less reduction amount due seller (line 520) | 33,464.94 |
| **303. CASH FROM BORROWER** | 13,069.49 | **603. CASH TO SELLER** | 258,928.19 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on the G41 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No. _____) with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: _____ / _____   SELLER(S) SIGNATURES _____ / _____

SELLER(S) NEW MAILING ADDRESS:

_____   BB   _____ (M)

| | | FUNDS AT SETTLEMENT | FUNDS AT SETTLEMENT |
|---|---|---|---|
| | Division of commission (line 700) as follows: | | |
| 701. $ | 8,734.49 | to Century 21 John D. McAllister | | |
| 702. $ | 8,760.00 | to R. A. Weidel Realtors - Doylestown | | |
| | 525.00 | to Century 21 John D. McAllister | | |
| 703. Commission paid at Settlement | | | 17,520.00 |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | | |
| 801. Loan Origination Fee | % Approved Mortgage Services | 1,387.00 | |
| 802. Loan Discount | % | | |
| 803. Appraisal Fee | to Approved Mortgage Services | 299.00 | |
| 804. Credit Report | to Approved Mortgage Services | 8.65 | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Application Fee | | | |
| 807. Broker Courier Fee | to Approved Mortgage Services | 40.29 | |
| 808. Tax Service Fee | to First Magnus Financial Corporation   LR | 80.00 | |
| 809. Flood Certification Fee | to First Magnus Financial Corporation   LR | 15.00 | |
| 810. Condiment Fee | to First Magnus Financial Corporation   LR | 450.00 | |
| 811. Yield Spread Premium | to Approved Mortgage Services   $4,854.53 POC by Lender | | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | |
| 901. Interest From   07/16/2004 to 08/01/2004   @5   $2.9760 /day   16 Days   LR | 847.61 | |
| 902. Mortgage Insurance Premium for | to | | |
| 903. Hazard Insurance Premium for | to | | |
| 904. | | | |
| 905. | | | |
| 1000. RESERVES DEPOSITED WITH LENDER FOR | | | |
| 1001. Hazard Insurance | 2 mo. @ $ | 70.25 /mo   LR | 140.50 | |
| 1002. Mortgage Insurance | mo. @ $ | /mo | | |
| 1003. City Property Tax | mo. @ $ | /mo | | |
| 1004. County Property Tax | 4 mo. @ $ | 70.76 /mo   LR | 283.04 | |
| 1005. Annual Assessments | mo. @ $ | 333.33 /mo | | |
| 1007. School Taxes | 1 mo. @ $ | 329.80 /mo   LR | 329.80 | |
| 1008. | | 0.00 | 0.00 |
| 1100. TITLE CHARGES | | | |
| 1101. Settlement or closing fee | | | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title insurance binder | | | |
| 1105. Document Preparation | | | |
| 1106. Notary/Clerical Fees | to Clerk | 25.00 | |
| 1107. Attorney's fees | | | |
|    (includes above items No:         ) | | | |
| 1108. Title Insurance | to Princeton Assurance Corporation | 1,618.75 | |
|    (includes above items No:         ) | | | |
| 1109. Lender's Policy | 277,608.00 | | |
| 1110. Owner's Policy | 292,008.00 - 1,618.75 | | |
| 1111. End 100, End 300, End 900 | to Princeton Assurance Corporation | 150.00 | |
| 1112. | | | |
| 1113. Closing Svc Ltr | to Princeton Assurance Corporation | 35.00 | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | | |
| 1201. Recording Fees Deed $ 65.00 | ; Mortgage $ 85.00   : Release $ | 150.00 | |
| 1202. City/County tax/stamps | Deed $     ; Mortgage $ 2,420.00 | | 2,420.00 |
| 1203. State Tax/stamps | Deed $2,920.00    ; Mortgage $ | 2,920.00 | |
| 1204. Mortgage Release Fee | to Princeton Assurance Corp. | | 55.00 |
| 1205. Local Deed Registry | to Princeton Assurance Corp. | 25.00 | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | | |
| 1301. Overnights | to Princeton Assurance Corp. | 25.00 | 40.00 |
| 1302. Wire In Fee | to Princeton Assurance Corp. | 25.00 | |
| 1303. Conveyancing Fee | to Weidel Conveyancing | 195.00 | |
| 1304. Reimburse Century 21 for Certs | to Century 21 John D. McAllister | | 90.00 |
| 1305. Final Sewer | to East Norriton Township | | 219.03 |
| 1306. School Tax | to HAB-RET | 3,951.65 | |
| 1307. | | | |
| 1308. | | | |
| 1400. TOTAL SETTLEMENT CHARGES | (enter on lines 103, Section J and 502, Section K) | 13,199.99 | 20,844.03 |

HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Mary L. Cain

# EXHIBIT B

# EXHIBIT B

MIN 1000382200600320359
MERS Phone: 1-888-679-6377

# NOTE

LOAN NO.: 2006003035

JULY 16, 2004      PENNINGTON      NEW JERSEY
[Date]      [City]      [State]

3301 LISA LANE, NORRISTOWN, PA 19403
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    277,400.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will  pay interest at a yearly rate of    6.875    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st    day of each month beginning on    SEPTEMBER, 2004    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    AUGUST 01, 2034    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION
9283 EAST WILLIAMS CIRCLE, SUITE 2000, TUCSON, AZ 85711      or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    1,822.32

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3200 1/01

VMP-6N (0207)      Page 1 of 3      LENDER SUPPORT SYSTEMS, INC. 6N.NEW (04/03)

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of         15       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be         5.000       % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Initials: _____

VMP-5N (0007)                    Page 2 of 3                    Form 3200 1/01

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note ,p rotects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions Im ay be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

MARY L CAW _____ (Seal)          _____ (Seal)
                              -Borrower                         -Borrower

_____ (Seal)          _____ (Seal)
                 -Borrower                         -Borrower

_____ (Seal)          _____ (Seal)
                 -Borrower                         -Borrower

_____ (Seal)          _____ (Seal)
                 -Borrower                         -Borrower

VMP-6N (0207)                    Page 3 of 3

Prepared By:

FIRST MAGNUS FINANCIAL CORPORATION
5285 E. WILLIAMS CIRCLE, #2000
TUCSON, AZ 85711

Return To:

FIRST MAGNUS FINANCIAL CORP.

5285 E. WILLIAM CIRCLE, #2000
TUCSON, AZ 85711

Parcel Number:
330005233006

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

LOAN NO.: 2005003035

MIN   100039220050030358
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          JULY 16, 2004
together with all Riders to this document.
(B) "Borrower" is
MARY L. CAIN, AN UNMARRIED WOMAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint MI 48501-2026, tel. (888) 679-MERS.

PENNSYLVANIA -Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3039   1/01
VMP-6A(PA) (0306)                              Page 1 of 19          LENDER SUPPORT SYSTEMS INC. MERS6APA.NEW (10/02)

(D) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a CORPORATION
organized and existing under the laws of  ARIZONA
Lender's address is
5285 EAST WILLIAMS CIRCLE, SUITE 2000, TUCSON, AZ  85711
(E) "Note" means the promissory note signed by Borrower and dated          JULY 16, 2004
The Note states that Borrower owes Lender
TWO HUNDRED SEVENTY SEVEN THOUSAND FOUR HUNDRED AND NO/100 X X X X X X X X
                                                                                                                                       Dollars
(U.S. $ 277,400.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   AUGUST 01, 2034
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
|---|---|---|
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☐ Other(s) [specify] | | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

VMP-6A(PA) 8208                                        Page 2 of 18                                        Form 3038  1/01

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the                COUNTY
[Type of Recording Jurisdiction] of        MONTGOMERY        [Name of Recording Jurisdiction]:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

| | 3301 LISA LANE | | [Street] |
| NORRISTOWN | [City] , Pennsylvania | 19403 | [Zip Code] |

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

VMP-6A(PA) (0000)                    Page 3 of 16                    Form 3039   1/01

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These Items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

VMP-6A(PA) (0306)                    Page 6 of 16                    Form 3039   1/01

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be

dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to

have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or

VMP-6A(PA) (0200)                    Page 12 of 16                    Form 3038   1/01

agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. Reinstatement Period. Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. Purchase Money Mortgage. If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

VMP-6A(PA) (0209)                     Page 14 of 16                     Form 3039  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
-Witness

_____
-Witness

_____ (Seal)          _____ (Seal)
MARY L. CAIN                        -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                          -Borrower

VMP-6A(PA) (0209)                    Page 16 of 16                       Form 3039   1/01

**Certificate of Residence**

I,                                                        , do hereby certify that
the correct address of the within-named Mortgagee is P.O. Box 2026, Flint, MI 48501-2026.

Witness my hand this                         day of

_____

Agent of Mortgagee

COMMONWEALTH OF PENNSYLVANIA,                                     County ss:

On this, the                         day of                              , before me, the
undersigned officer, personally appeared
MARY L. CAIN

known to me (or
satisfactorily proves) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
*My Commission Expires:*

_____

_____

Title of Officer

VMP-6A(PA) (0309)                    Page 16 of 16                    Form 3039   1/01

**EXHIBIT C**

## FEDERAL TRUTH - IN - LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Creditor:  
FIRST PHOENIX FINANCIAL CORPORATION, AN ARIZONA  
CORPORATION

Borrower:  
MARY L. CAIN

1220 CHAPEL AVE SUITE 169  
CHERRY HILL, NJ 08002  
Date: JULY 16, 2004  
Check box if applicable:

3301 LISA LANE  
NORRISTOWN, PA 19403  
Loan Number: 2005001015

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | [ ] Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total cost of your purchase on credit including your down-payment of $ N/A |
| 7.891 % | $ 409,400.10 | $ 273,080.10 | $ 682,480.20 | $ N/A |

[ ] REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 120 | 2,034.99 | 09/01/2004 | | | | | | |
| 35 | 1,968.85 | 09/01/2014 | | | | | | |
| 220 | 1,822.13 | 09/01/2016 | | | | | | |

THE PAYMENTS SHOWN HERE INCLUDE A MONTHLY PREMIUM FOR "PRIVATE MORTGAGE INSURANCE" AS REQUIRED BY LENDER. Generally, under the Homeowners Protection Act of 1998, "Private Mortgage Insurance" terminates before the loan expires.

[ ] DEMAND FEATURE: This obligation has a demand feature.  
[ ] VARIABLE RATE: Your loan contains variable rate features.  
    [ ] Information regarding the variable rate features of your loan have been provided to you earlier in a separate document.  
    [ ] Information regarding the variable rate features of your loan are provided hereinafter. The annual percentage rate may increase or decrease during the term of this transaction with increases or decreases in the value of the "Index" (or "Reference Rate"). The rate that you will pay may not be changed more often than every _____ commencing _____.  
       [ ] Rate Change Limits: The rate may not be changed by more than _____ % on any one Rate Change Date.  
       [ ] The rate will never be greater than _____ %  
       [ ] Any increase in the rate will result in a corresponding increase in the payment.  
       [ ] Rate increases may occur without immediate and/or corresponding payment increases.  
       [ ] Unpaid interest will be added to the principal.  
       The "Index" (or "Reference Rate") is the:

INSURANCE: The following insurance is required to obtain credit:  
[ ] Credit life insurance and credit disability     [X] Property insurance     [ ] Flood insurance  
You may obtain the insurance from anyone you want that is acceptable to creditor.  
[ ] If you purchase [ ] property [ ] flood insurance from creditor you will pay $ _____ for one year term.  
SECURITY: You are giving a security interest in:  
3301 LISA LANE, NORRISTOWN, PA 19403  
[X] The goods or property being purchased     [ ] Real property you already own.  
FILING FEES: $  
LATE CHARGE: If a payment is more than 15 days late, you will be charged $.00 % of the payment.  
PREPAYMENT: If you pay off early, you  
[ ] may   [X] will not   have to pay a penalty.  
[ ] may   [X] will not   be entitled to a refund of part of the finance charge.  
ASSUMPTION: Someone buying your property  
[ ] may [ ] may, subject to conditions [X] may not   assume the remainder of your loan on the original terms.  
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.  
[ ] e means an estimate     [ ] all dates and numerical disclosures except the late payment disclosures are estimates.  
The undersigned acknowledge receiving and reading a completed copy of this disclosure.  
Neither now nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.  
[ ] I/We have received the Variable Rate Disclosure for the loan program for which I/We have applied.

MARY L. CAIN        Date             Date

Date                Date

"FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT" - PAGE 2
"ITEMIZATION OF AMOUNT FINANCED"

Creditor:                                          Re:
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA     MARY L. CAIN
CORPORATION
1620 CHAPEL AVE SUITE 169
CHERRY HILL, NJ 08002

                                                   3341 LISA LANE
                                                   NORRISTOWN, PA 19403

Date:  JULY 16, 2004
Interest Rate:  6.875 %                            Loan Number:  2005003035

                                                   Loan Amount: 277,400.00

| | | | |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |

**Amount Paid to Others on Your Behalf**

| | | | |
|---|---|---|---|
| 809 | APPRAISAL FEE TO BROKER | $ 290.00 | B |
| 904 | CREDIT REPORT FEE TO BROKER | $ 8.63 | B |
| 1001 | HAZARD INSURANCE 2 MONTHS @ $ 70.25 PER MO. | $ 140.50 | |
| 1004 | COUNTY PROPERTY TAXES 4 MONTHS @ $ 70.76 PER MO. | $ 283.04 | |
| | SCHOOL TAXES 1 MONTHS @ $ 329.90 PER MONTH | $ 329.90 | |
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

| | | | |
|---|---|---|---|
| LOAN PROCEEDS PAID TO: | PRINCETON ASSURANCE CORPORATION | $ 273,028.01 | |

AMOUNT FINANCED $ 273,080.10

**Prepaid Finance Charge ... PAID TO ... FINANCED TO**

| | | | |
|---|---|---|---|
| 801 | LOAN ORIGINATION FEE (pd to broker)  0.500 % | $ 1,387.00 | B |
| | TAX SERVICE FEE TO LENDER | $ 80.00 | |
| 1101 | SETTLEMENT/CLOSING FEE TO OTHER | $ 1,500.00 | O |
| 901 | INTEREST 14 DAYS @ $ 53.976 /DAY | $ 847.63 | |
| | FLOOD CERTIFICATION FEE TO LENDER | $ 15.00 | |
| | COMMITMENT FEE TO LENDER | $ 450.00 | |
| | COURIER FEE TO BROKER | $ 40.29 | B |
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

Total Prepaid Finance Charge $ 4,319.90

**These are FEES NOT paid by the Borrower ... AMOUNT FINANCED**

| | | | |
|---|---|---|---|
| | YIELD SPREAD PREMIUM 1.750 % | $ 4,854.50 | |
| | | $ | |
| | | $ | |

**Total Estimated Funds needed to Close ... TOTAL MONTHLY PAYMENT**

| | | | |
|---|---|---|---|
| Down Payment | $ 14,600.00 | Principal & Interest | $ 1,822.32 |
| Estimated Closing Costs | $ 3,770.94 | Total Real Estate Taxes | $ 70.76 |
| Estimated Prepaid Items/Reserves | $ 1,601.05 | Flood & Hazard Insurance | $ 70.25 |
| Other:  TOTAL PAYOFFS | $ | Mortgage Insurance | $ 212.67 |
| TOTAL EST. FUNDS NEEDED TO CLOSE $ 19,971.99 | | Total Other Impounds | $ 329.90 |
| | | TOTAL MONTHLY PAYMENT | $ 2,505.90 |

This form does not cover all items you will be required to pay in cash at settlement; for example, deposits in escrow for real estate taxes and insurance may be required. You may wish to inquire as to the amounts of such other items. You may be required to pay other additional amounts at settlement.
Neither you nor the lender previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure. Each of the Undersigned acknowledges receiving and reading a completed copy of this disclosure.

[X] All disclosures are estimates

MARY L. CAIN _____ Date _____        _____ Date _____

                                                      _____ Date _____

## PAYMENT LETTER TO BORROWER

FROM: FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

1820 CHAPEL AVE SUITE 159, CHERRY HILL, NJ 08002

TO: MARY L CAIN

Property Address: 3301 USA LANE, NORRISTOWN, PA 19403

Loan Number: 2005003035

Dear Borrower:

Disclosed below is an estimate of the amount of your initial monthly payment for the loan referred to above. Payments are scheduled to begin _____ SEPTEMBER 01, 2004 _____ , with the final payment due on AUGUST 01, 2034.

A. [XX] The interest rate and payment amount are scheduled to remain level throughout the loan term.

B. [   ] This is a Graduated Payment loan which means that even though the interest rate will not change, the payments will increase in the second year and each year thereafter for the next _____ years. A schedule of the subsequent monthly payment amounts is provided to you on the Federal Truth in Lending Disclosure Statement.

C. [   ] This is an Adjustable Rate loan which means that the monthly payment amounts may vary from time to time in conjunction with adjustments in the interest rate. Review the Federal Truth In Lending Disclosure Statement and your Promissory Note for more information concerning future payment amounts.

Your initial monthly payment amount will consist of the following:

| | | |
|---|---|---|
| PRINCIPAL AND INTEREST | $ | 1,822.32 |
| MMI/PMI MONTHLY PREMIUM | $ | 212.67 * |
| RESERVE FOR COUNTY PROPERTY TAXES | $ | 70.76 * |
| HAZARD INSURANCE RESERVE | $ | 70.25 * |
| FLOOD INSURANCE RESERVE | $ | -0- * |
| CITY PROPERTY TAXES | $ | -0- * |
| ANNUAL ASSESSMENTS | $ | -0- * |
| OTHER: SCHOOL TAXES | $ | 329.90 * |
| OTHER: | $ | * |
| OTHER: | $ | * |
| TOTAL INITIAL MONTHLY PAYMENT | $ | 2,505.90 |

* These items are estimates at this time; you will be given notice of the actual amount of your monthly payment upon closing of this transaction. Also, understand that these amounts may vary slightly from year to year requiring adjustments in the amount of your payment.

IT IS POSSIBLE THAT YOU WILL NOT RECEIVE YOUR FIRST "NOTICE OF PAYMENT DUE" BEFORE THE DUE DATE OF YOUR FIRST PAYMENT. Unless notified otherwise, please remit your first payment and all future payments to the following address:

FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

5285 EAST WILLIAMS CIRCLE, SUITE 2000
TUCSON, AZ 85711

During any correspondence or phone calls in connection with this loan, please give the loan number shown above for the lender's reference.

BY SIGNING BELOW, Borrower acknowledges reading this Payment Letter and receiving a copy of same.

_____          _____
MARY L CAIN                    Date                                    Date

_____          _____
                               Date                                    Date

# EXHIBIT D

13.3
65

Prepared By                          Return To:

FIRST MAGNUS FINANCIAL CORPORATION      FIRST MAGNUS FINANCIAL CORP
6285 E WILLIAMS CIRCLE, #2000
TUCSON, AZ 85711                     6285 E. WILLIAM CIRCLE, #2000
                                     TUCSON, AZ 85711

Parcel Number:
330006233008
————————————— [Space Above This Line For Recording Data] — PA04-3828

# MORTGAGE

LOAN NO..  2006003036                MIN  1000392200500303509
                                     MERS Phone  1 888 679 6377

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          JULY 16, 2004
together with all Riders to this document
(B) "Borrower" is
MARY L CAIN, AN UNMARRIED WOMAN   AND  MICHAEL  G. CAIN

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
33 00 05233 00 8  EAST NORRITON
3301 LISA RD
CICALA STEPHEN & JOANN
B 0046 U 046 L  160   1161  DATE 08/03/04

Borrower is the mortgagor under this Security Instrument
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns MERS is the mortgagee
under this Security Instrument MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint MI 48501 2026, tel  (888) 679 MERS.

PENNSYLVANIA  Single Family  Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3039  1/01
VMP-6A(PA) (0308)
                              Page 1 of 16        LENDER SUPPORT SYSTEMS INC M6336APA NEW (10/03)

MOR SK11234-0146
2004171899   06/25/2004 08 27 49 A V 30
ROD FEE  162 63

MONTGOMERY
COUNTY ROD
NANCY BECKER ROD

(D) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a CORPORATION
organized and existing under the laws of ARIZONA
Lender's address is
5285 EAST WILLIAMS CIRCLE, SUITE 2000, TUCSON, AZ 85711
(E) "Note" means the promissory note signed by Borrower and dated          JULY 16, 2004
The Note states that Borrower owes Lender
TWO HUNDRED SEVENTY SEVEN THOUSAND FOUR HUNDRED AND NO/100 X X X X X X X X
                                                                                                                        Dollars
(U.S. $ 277,400.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   AUGUST 01, 2034
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable].

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☐ Other(s) [specify] | | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,

VMP-6A(PA) (0308)                              Page 2 of 16                              Form 3039  1/01

# *First American Title Insurance Company*

Commitment No  PA04-3828

## SCHEDULE C
## Legal Description

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, situate in the Township of East Norriton, County of Montgomery and Commonwealth of Pennsylvania, bounded and described in accordance with a survey and plan of sub division #2 of Franklin Village made by George C. Heilman, Registered Surveyor, Norristown, Pennsylvania, on the 2nd day of November, A D , 1961, and last revised on the 8th day of April, A D , 1962, as follows, to wit

BEGINNING at a point of reverse curve on the Northeasterly side of Baldwin Avenue (fifty feet wide) which point of reverse curve is measured on the arc of the curve, curving to the right having a radius of thirty feet the arc distance of fifty seven and forty one hundredths feet from a point of curve on the Northwesterly side of Lisa Road (fifty feet wide), thence extending from said point of beginning along said side of Baldwin Avenue on the arc of a curve curving to the left having a radius of one thousand forty five and forty eight one-hundredths feet the arc distance of one hundred three and seventy nine one-hundredths feet to a point, a corner of lot #159 as shown on said plan, thence extending along the same North fifty five degrees eighteen minutes East, one hundred sixty and ninety two one hundredths feet to a point, a corner of Lot # 145 as shown on said plan, thence extending along the same, south forty eight degrees forty minutes East, one hundred and fifteen one-hundredths feet to a point on the Northwesterly side of Lisa Road; thence extending along the same South forty-one degrees twenty minutes West, one hundred fifty eight and forty two one-hundredths feet to a point of curve therein, thence extending on the arc of a curve curving to the right having a radius of thirty feet the arc distance of a fifty seven and forty one one hundredths feet to the first mentioned point and place of beginning on the said Northeasterly side of Baldwin Avenue.

BEING Lot # 160 as shown on said plan.

PARCEL NUMBER  33 00 05233 008

BEING THE SAME PREMISES WHICH Stephen S. Cicala and Joann Cicala by Indenture dated 04 05 93 and recorded 04 12 93 in the Office of the Recorder of Deeds in and for the County of Montgomery in Deed Book 5038 page 978, granted and conveyed unto Stephen Cicala and Joann Cicala, as tenants by the entireties.

(D) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument

(F) "RESPA" means the Real Estate Settlement Procedures Act (12 U S C Section 2601 et seq ) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the     COUNTY
[Type of Recording Jurisdiction] of    MONTGOMERY     [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF .. AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

which currently has the address of     1301 LISA COURT        [Street]
    NORRISTOWN    [City] , Pennsylvania     19403    [Zip Code]
("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property " Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument

VMP-6A(PA) (0806)       Page 3 of 18       Form 3038   1/01

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note. (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

can be paid in full  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3  Funds for Escrow Items  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for. (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property: (b) leasehold payments or ground rents on the Property, if any. (c) premiums for any and all insurance required by Lender under Section 5: and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds  Borrower and Lender can agree in writing, however, that interest

shall be paid on the Funds  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4  Charges; Liens  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

5  Property Insurance  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires  What Lender requires pursuant to the preceding sentences can change during the term of the Loan  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably  Lender may require Borrower to pay, in connection with this Loan, either  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower. Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30 day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6  Occupancy  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property, Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause

8.  Borrower's Loan Application  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9  Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court, and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in its bankruptcy proceeding  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off  Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has   if any   with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11   Assignment of Miscellaneous Proceeds, Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower   Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value, is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due

If the Property is abandoned by Borrower, or if   after notice by Lender to Borrower that t Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damage Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authoriz to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third p that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of actio regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun tha Lender's judgment, could result in forfeiture of the Property or other material impairment of Le interest in the Property or rights under this Security Instrument   Borrower can cure such a default a acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding

Page 10 of 18

VMP-6A(PA) #205